# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN THOMPSON, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No. _____ |
| v. ) ) | JURY TRIAL DEMANDED |
| TOWER INTERNATIONAL, INC., TONY BROWN, JAMES GOUIN, MARK MALCOLM, JAMES CHAPMAN, ALISON DAVIS-BLAKE, FRANK ENGLISH, DEV KAPADIA, AUTOKINITON US HOLDINGS, INC., and TIGER MERGER SUB, INC., ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.  This action stems from a proposed transaction announced on July 12, 2019 (the "Proposed Transaction"), pursuant to which Tower International, Inc. ("Tower" or the "Company") will be acquired by Autokiniton US Holdings, Inc. ("Parent") and Tiger Merger Sub, Inc. ("Merger Sub," and together with Parent, "Autokiniton"), which are affiliates of Autokiniton Global Group.

2.  On July 12, 2019, Tower's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Autokiniton. Pursuant to the terms of the Merger Agreement, Merger Sub commenced a tender offer (the "Tender Offer") to acquire all of Tower's outstanding common

stock for $31.00 per share in cash. The Tender Offer is scheduled to expire on September 13, 2019.

3. On August 15, 2019, defendants filed a Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Tower common stock.

9. Defendant Tower is a Delaware corporation and maintains its principal executive offices at 17672 Laurel Park Drive North, Suite 400F, Livonia, Michigan 48152. Tower's common stock is traded on the New York Stock Exchange under the ticker symbol "TOWR."

10. Defendant Tony Brown is Chairman of the Board of the Company.

11. Defendant James Gouin is Chief Executive Officer and a director of the Company.

12. Defendant Mark Malcolm is a director of the Company.

13. Defendant James Chapman is a director of the Company.

14. Defendant Alison Davis-Blake is a director of the Company.

15. Defendant Frank English is a director of the Company.

16. Defendant Dev Kapadia is a director of the Company.

17. The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18. Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

19. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Tower (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of July 10, 2019, there were approximately 20,690,472 shares of Tower common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

3

23. Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

27. Tower is a leading manufacturer of engineered automotive structural metal components and assemblies primarily serving original equipment manufacturers.

28. The Company offers automotive customers a broad product portfolio, supplying body-structure stampings, frame and other chassis structures, and complex welded assemblies for small and large cars, crossovers, pickups, and sport utility vehicles.

29. On July 12, 2019, Tower's Board caused the Company to enter into the Merger Agreement with Autokiniton.

30. Pursuant to the terms of the Merger Agreement, Merger Sub commenced the Tender Offer to acquire all of Tower's outstanding common stock for $31.00 per share in cash.

31. According to the press release announcing the Proposed Transaction:

Autokiniton Global Group ("AGG"), a leading North American supplier of metal-formed components and complex assemblies to the automotive industry, and Tower International, Inc. (NYSE: TOWR), a leading manufacturer of engineered automotive structural metal components and assemblies, today announced they have entered into a definitive agreement for AGG to acquire Tower for $31 per share in cash. AGG is a portfolio company of KPS Capital Partners ("KPS"), a leading global private equity firm with over $5.0 billion of assets under management.

The all-cash transaction represents a 70% premium to Tower's closing stock price on July 11, 2019. Including Tower's debt and pension related liabilities, the total value of the transaction is approximately $900 million. . . .

Terms of the Transaction

Under the terms of the definitive merger agreement, AGG will commence a tender offer no sooner than August 14, 2019 and no later than August 19, 2019 to acquire all of the outstanding shares of common stock of Tower for $31.00 per share in cash. The tender offer will be subject to customary closing conditions, including the tender of at least a majority of the outstanding shares of Tower common stock and the expiration or early termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Following the closing of the tender offer, a wholly-owned subsidiary of AGG will merge with and into Tower (the "Merger"), with each share of Tower common stock that has not been tendered being converted into the right to receive the same $31.00 per share in cash offered in the tender offer.

The definitive agreement includes a 35 day "go-shop" period, which permits Tower's Board and financial advisor to actively initiate, solicit and consider alternative acquisition proposals. Tower will have the right to terminate the merger agreement to accept a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this 35 day "go-shop" will result in a superior proposal, and Tower does not intend to disclose developments with respect to the solicitation process unless and until the Board makes a determination requiring further disclosure.

Tower will file its quarterly report on Form 10-Q reporting its second quarter financial results but does not intend to host a quarterly earnings call. Additionally, Tower has agreed to forego paying dividends through the consummation of the transaction.

J.P. Morgan Securities LLC is serving as exclusive financial advisor for Tower and rendered a fairness opinion. Houlihan Lokey Capital, Inc. provided an additional fairness opinion for Tower. Lowenstein Sandler LLP is serving as the legal advisor to Tower. Goldman Sachs & Co. and Bank of America Merrill Lynch, are serving as the financial advisors for AGG and Paul, Weiss, Rifkind, Wharton & Garrison LLP is serving as the legal advisor to AGG.

32. The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.5(a) of the Merger Agreement provides, in relevant part:

> (ii) At the Solicitation Period End Time (or, with respect to any Excluded Party, at 12:01 a.m. New York City time on the tenth (10th) day after the date on which the Solicitation Period End Time occurs (the "Cut-Off Time")): (A) the Company shall, and shall cause each of its directors, officers, Representatives and Affiliates to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Person (other than Parent, its Affiliates and its and their respective Representatives) relating to any Acquisition Proposal or any inquiry, discussion, offer or request that would reasonably be expected to lead to an Acquisition Proposal; (B) the Company shall as promptly as possible (and in any event within twenty-four (24) hours) send written notice of such termination to any and all Persons with whom it is terminating solicitations, discussions or negotiations under the foregoing clause (A); (C) the Company shall as promptly as possible (and in any event within twenty-four (24) hours) request that each Person (other than Parent, its Affiliates and its and their respective Representatives) that has previously executed a confidentiality or similar agreement in connection with its consideration of an Acquisition Proposal to return to the Company or destroy any non-public information previously furnished or made available to such Person or any of its Representatives by or on behalf of the Company or its Representatives in accordance with the terms of the confidentiality agreement in place with such Person; and (D) the Company shall as promptly as possible (and in any event within twenty-four (24) hours) terminate dataroom access from any such Person and its Representatives. Notwithstanding anything in this Section 5.5 to the contrary, the Company shall not, and shall cause its Affiliates not to, reimburse or agree to reimburse the expenses of any Person (other than the Company's Representatives

6

or Parent, its Affiliates or its or their respective Representatives) in connection with an Acquisition Proposal or any inquiry, discussion, offer or request that would reasonably be expected to lead to an Acquisition Proposal. . . .

(b) From the Solicitation Period End Time (or, in the case of an Excluded Party, the Cut-Off Time) until the earlier of the Effective Time and the valid termination of this Agreement, except as expressly permitted by this Section 5.5, the Company shall not (and shall not publicly announce any intention to), directly or indirectly, and the Company shall cause each of its Subsidiaries not to, and the Company shall cause its and their respective Representatives not to, (i) initiate, solicit, knowingly facilitate or knowingly encourage any inquiry, discussion or request with respect to, or the making of, any proposal or offer that would reasonably be expected to lead to, or that constitutes, any Acquisition Proposal (provided, that the foregoing shall not prohibit the Company or any of its Representatives from contacting any Person who has made an Acquisition Proposal (or such Person's Representatives) solely for the purpose of clarifying such Acquisition Proposal and any material terms thereof), (ii) engage or enter into, continue or otherwise participate in any negotiations or discussions concerning, or otherwise cooperate with, knowingly assist or participate in, knowingly facilitate or provide access to any non-public information or data or to its properties, books, records or personnel to any Person relating to an Acquisition Proposal, (iii) approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Acquisition Proposal or (iv) resolve or agree to take any of the foregoing actions. From the date of this Agreement until the earlier of the Effective Time and the valid termination of this Agreement, except as expressly permitted by this Section 5.5, (A) the Company shall not (and shall not publicly announce any intention to), directly or indirectly, and the Company shall cause each of its Subsidiaries not to, and the Company shall cause its and their respective Representatives not to, (x) execute or enter into any letter of intent, agreement in principle, merger agreement, acquisition agreement or other agreement, understanding or arrangement relating to any Acquisition Proposal (an "Alternative Acquisition Agreement") or any Contract requiring the Company to abandon, terminate or fail to consummate the Offer, the Merger or the other transactions contemplated hereby, (y) take any action to make the provisions of any Takeover Statute, or any restrictive provision of the Company Organizational Documents inapplicable to any Acquisition Proposal or to any Person making an Acquisition Proposal, or (z) resolve or agree to take any of the foregoing actions and (B) the Company and its Subsidiaries shall not terminate, amend, modify or waive any provision of any confidentiality, "standstill" or similar agreement to which the Company or any of its Subsidiaries is a party; provided, however, that nothing in this Section 5.5, including clause (B) hereof, shall prohibit the Company and its Subsidiaries from granting a waiver with respect to, rendering inapplicable or otherwise exempting a Person from any "standstill" obligation with respect to the Company to the extent necessary to permit a Person to make an Acquisition Proposal. Any violation or breach of the restrictions or obligations set forth in this Section 5.5 by any Subsidiary of the Company or any Representative of the Company or any of its Subsidiaries acting on behalf of or at

7

the direction of the Company or any of its Subsidiaries shall be deemed to be a breach of this Section 5.5 by the Company.

33. Additionally, the Company must promptly advise Autokiniton of any proposals or inquiries received from other parties. Section 5.5(d) of the Merger Agreement states, in relevant part:

> As promptly as reasonably practicable (and in any event no later than twenty-four (24) hours) following the receipt thereof (in each case, after the Solicitation Period End Time), the Company shall (A) notify Parent in writing of the receipt of any Acquisition Proposal or any inquiry or request with respect to, or that would reasonably be expected to lead to an Acquisition Proposal, which notice shall include the material terms and conditions (whether written or oral) of such Acquisition Proposal (including the identity of the Person or group making such Acquisition Proposal, the price per share, structure, closing conditions, and regulatory and financing provisions), and (B) deliver to Parent copies of all written proposals, letters of interest, term sheets, commitment letters, proposed definitive documents or similar documents relating to any Acquisition Proposal received by the Company or its Representatives from any such offeror or its Representatives. The Company will keep Parent reasonably informed in all material respects of any material developments with respect to any such Acquisition Proposal (and any subsequent amendments or modifications thereto) and deliver copies of revised or newly received documents received by the Company or its Representatives from any such offeror or its Representatives to Parent, in each case, as soon as is reasonably practicable and in any event within twenty-four (24) hours of receipt, provision or occurrence thereof. The Company shall, as soon as is reasonably practicable and in any event within twenty-four (24) hours following a determination by the Company Board that an Acquisition Proposal is a Superior Proposal, notify Parent of such determination.

34. Moreover, the Merger Agreement contains a "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants Autokiniton a "matching right" with respect to any "Superior Offer" made to the Company. Section 5.5(f) of the Merger Agreement provides:

> Notwithstanding anything in this Section 5.5 to the contrary, at any time prior to the Offer Acceptance Time, if and only if the Company receives a bona fide, written Acquisition Proposal that did not result from a material breach of the terms of this Section 5.5, the Company Board may (x) make an Adverse Company Board Recommendation Change with respect to such Acquisition Proposal or (y) cause the Company to terminate this Agreement in order to enter into a definitive

8

agreement with respect to such Acquisition Proposal in accordance with Section 7.1(d)(ii), in each such case if and only if (A) the Company Board shall have determined in good faith, after consultation with its financial advisors and outside legal counsel, that such Acquisition Proposal, if accepted, is a Superior Proposal and (B) the Company Board shall have determined in good faith, after consultation with its outside legal counsel, that its failure to effect an Adverse Company Board Recommendation Change with respect to such Acquisition Proposal or to terminate this Agreement in order to enter into a definitive agreement with respect to such Acquisition Proposal, would be inconsistent with its fiduciary duties to the stockholders of the Company under applicable Law; provided, that, notwithstanding the other provisions of this Section 5.5(f), the Company Board may not effect an Adverse Company Board Recommendation Change and the Company may not terminate this Agreement pursuant to the foregoing clause (y) unless:

(i) the Company shall have provided prior written notice to Parent, at least five (5) Business Days in advance (the "Superior Proposal Notice Period"), of its intention to effect such an Adverse Company Board Recommendation Change or termination (which notice itself shall not constitute an Adverse Company Board Recommendation Change or termination) with respect to such Superior Proposal, which notice shall specify the material terms and conditions of such Superior Proposal and the identity of the Person or group making such Superior Proposal, and shall have contemporaneously provided a copy of all relevant proposed definitive transaction agreements with the Person making such Superior Proposal;

(ii) if requested by Parent, the Company shall have negotiated with, and shall have caused its Representatives to negotiate with, Parent in good faith during the Superior Proposal Notice Period in order to enable Parent to revise the terms of this Agreement in such a manner that would eliminate the need for taking such action (and would cause such Superior Proposal to no longer constitute a Superior Proposal);

(iii) following the Superior Proposal Notice Period and after considering the results of any negotiations and giving effect to any proposals, amendments or modifications offered, made or agreed to in writing by Parent, if any, the Company Board (after consultation with its financial advisor and outside legal counsel) shall have determined in good faith, that such Superior Proposal continues to constitute a Superior Proposal (it being understood and agreed that any change to the financial or other material terms of an Acquisition Proposal that was previously the subject of a notice hereunder shall require a new notice to Parent as provided above, but with respect to any such subsequent notices the Superior Proposal Notice Period shall be deemed to be four (4) Business Days rather than five (5) Business Days); and

(iv) if the Company Board determines to terminate this Agreement in accordance with this Section 5.5(f) and Section 7.1(d)(ii), the Company pays the applicable

9

Company Termination Fee to Parent prior to or concurrently with such termination and promptly enters into the applicable Alternative Acquisition Agreement.

35. The Merger Agreement also provides for a "termination fee" of up to $19,850,000 payable by the Company to Autokiniton if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Solicitation Statement Omits Material Information, Rendering It False and Misleading***

36. Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.

37. As set forth below, the Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading.

38. First, the Solicitation Statement omits material information regarding the Company's financial projections.

39. The Solicitation Statement fails to disclose: (i) with respect to the "Initial Company Projections" and the "Updated Company Projections," all line items used to calculate Adjusted EBITDA and Adjusted EBIT; (ii) the "Base Case"; (iii) the "Midcycle Case"; and (iv) a reconciliation of all non-GAAP to GAAP metrics.

40. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

41. Second, the Solicitation Statement omits material information regarding the analyses performed by the Company's financial advisors in connection with the Proposed Transaction, J.P. Morgan Securities LLC ("J.P. Morgan") and Houlihan Lokey Capital, Inc. ("Houlihan").

42. With respect to J.P. Morgan's Discounted Cash Flow Analysis, the Solicitation Statement fails to disclose: (i) the future standalone unlevered after-tax free cash flows for fiscal year 2019 through fiscal year 2023 and all underlying line items; (ii) the ranges of terminal values for the Company; (iii) the individual inputs and assumptions underlying the range of discount rates from 10.25% to 11.25% and the terminal growth rate ranging from 1.5% to 2.5%; (iv) the net operating losses and research and development credit carry forwards of the Company for the projections period; and (v) the Company's net debt.

43. With respect to J.P. Morgan's Analyst Price Target analysis, the Solicitation Statement fails to disclose: (i) the price targets observed by J.P. Morgan in the analysis; and (ii) the sources thereof.

44. With respect to Houlihan's Discounted Cash Flow Analysis, the Solicitation Statement fails to disclose: (i) the unlevered free cash flows used by Houlihan in the analysis and all underlying line items; (ii) the terminal values for the Company; and (iii) the individual inputs and assumptions underlying the discount rates ranging from 10.0% to 12.0% and the perpetual growth rates ranging from 1.5% to 2.5%.

45. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

46. Third, the Solicitation Statement omits material information regarding potential conflicts of interest of J.P. Morgan and Houlihan.

47. The Solicitation Statement fails to disclose the "commercial or investment banking relationships with the Company and certain of its affiliates and certain affiliates of KPS" that J.P. Morgan currently "continue[s] to have," as well as the amount of compensation that J.P. Morgan

11

will receive in connection therewith. Similarly, the Solicitation Statement fails to disclose the amount of compensation and financial benefits J.P. Morgan receives and will receive for its affiliate acting as "an agent bank and a lender under outstanding credit facilities of an affiliate of the Company."

48. The Solicitation Statement fails to disclose the timing and nature of the past services Houlihan provided to the Company, as well as the amount of compensation Houlihan received for providing such services.

49. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

50. Fourth, the Solicitation Statement fails to disclose whether the Company entered into any confidentiality agreements that contain "don't ask, don't waive" provisions.

51. The omission of the above-referenced material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following section of the Solicitation Statement: The Solicitation or Recommendation.

52. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**(Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)**

53. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

54. Section 14(e) of the 1934 Act states, in relevant part, that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

55. Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not misleading.

56. The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

57. The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

58. By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

59. The omissions in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available.

60. Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

61. By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

62. Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

63. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**(Claim for Violation of 14(d) of the 1934 Act Against Defendants)**

64. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

65. Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

66. Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

67. The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

68. Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

69. The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

14

70. Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### (Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Autokiniton)

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. The Individual Defendants and Autokiniton acted as controlling persons of Tower within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as directors of Tower and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

73. Each of the Individual Defendants and Autokiniton was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

74. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly connected with and involved in the making of the Solicitation Statement.

75. Autokiniton also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was

omitted and/or misrepresented in the Solicitation Statement.

76. By virtue of the foregoing, the Individual Defendants and Autokiniton violated Section 20(a) of the 1934 Act.

77. As set forth above, the Individual Defendants and Autokiniton had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

78. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

79. Plaintiff and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A. Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.  Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 20, 2019

**RIGRODSKY & LONG, P.A.**

By: */s/ Gina M. Serra*
Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
Email: rm@maniskas.com